**WOLCOTT v. UNITED STATES.**

**COUVILLION v. UNITED STATES.**
**Civ. A. Nos. 2422, 2423.**

United States District Court
W. D. Louisiana, Alexandria Division.

Sept. 1, 1950.

Philo Coco, Marksville, La., for plaintiffs.

Malcolm E. Lafargue, William J. Fleniken, Shreveport, La., for defendant.

DAWKINS, Chief Judge.

These actions in tort grew out of a single accident, were consolidated for the purposes of trial and will be disposed of in the same manner.

### The Facts

The facts which are undisputed upon the question of liability are specifically found as follows:

On March 9, 1948, about 11 o'clock A.M., the two plaintiffs were traveling in an automobile in a northerly direction on the Marksville-Alexandria, paved public highway, with Wolcott, the owner at the wheel, and Couvillion, a guest, sitting beside him on the front seat. A short distance south of the limits of the City of Alexandria, an ambulance belonging to the United States and in charge of the Corps of Engineers was parked in front of the Star Grocery on the east or right-hand side of the highway approaching the city, with its rear end several feet off the pavement. The Wolcott automobile was traveling at such a speed that when the driver noticed the ambulance backing onto the highway, his brakes were applied and he ran off onto the left dirt shoulder. The ambulance was driven by a colored man employed by the Corps of Engineers, by the name of Alec White, and its rear end reached the black center line at an obtuse angle, preparatory to proceeding along the same lane of traffic, or right side, on which the Wolcott car was traveling. After passing the ambulance, Wolcott attempted to return to the pavement. It had rained earlier that morning, though none was falling at the time, the pavement was higher than the shoulder, and instead of righting itself onto the highway, the automobile turned over three times, resulting in injuries to both occupants. Before starting to back onto the highway, White testified he had gone on foot to a point where he could see to the south, and that he saw no vehicle approaching; that he then returned to his ambulance and backed onto the highway. His seat being on the north or opposite side from which the Wolcott car approached, made it impossible for him to see any further after getting into the ambulance, for the reason that it had a closed panel body with no windows to the rear or on the sides through which the driver could look to the south.

The disputed issues of fact are as to how close the automobile was to the point where the ambulance backed onto the highway when the latter started moving, whether it backed suddenly or slowly, the rate at which the automobile was traveling, and whether by the exercise of reasonable care Wolcott could, under the circumstances, have avoided striking it by means other than those used. Both Wolcott and Couvillion testified that the backing was sudden and rapid and at a time when they were too close to stop at the speed they were traveling of forty-five miles per hour. Nothing was offered by the defense as to the speed of the automobile other than the fact that it turned over three times after applying the brakes and finally landed approximately 100 feet beyond the

ambulance. Another motorist by the name of Penny testified that the automobile passed him about a mile from where the accident happened, that he was traveling at a speed of about forty miles per hour, that he followed behind the automobile, saw the "ambulance back out onto the highway until its rear end, I imagine, came to about the black line in the center of the highway, and this car ahead of me swerved and missed the ambulance and ran off the road and then started back upon the highway and then turned over three times, and the ambulance turned back into the driveway when he heard the noise. I don't know whether he heard the car or not, but he ran back into the driveway * * *." As to the rate at which the ambulance backed, Penny said: "It wasn't too sudden, about the regular speed, angling and backing up." In response to the question as to how far Wolcott was from the ambulance when it backed onto the highway, his reply was: "Just went by the corner of it; just narrowly escaped hitting him." Penny further stated that he did not "believe" it could have stayed on the pavement and missed hitting the ambulance. Another witness also proceeding north on foot some 300 feet from the grocery, gave similar testimony. There were no signals given by the driver of the ambulance of his intention to back onto the highway. On cross-examination, Penny stated that the curve in the road was about five-tenths of a mile from the accident. A map furnished by the U. S. Engineers showed this curve to be much further. However, by actual measurement of the skid marks on the pavement, the automobile traveled 37½ feet at an angle to the left side of the road before its left front wheel went off on the shoulder. These marks, which demonstrated application by Wolcott of his brakes, began a little more than half this distance, or about 19 or 20 feet from the rear end of the ambulance in the right-hand lane of traffic, and the attempt to return to the pavement, as shown by skid marks on the shoulder, was just 36 feet from the point the left went off to where the right front wheel struck the pavement and the car began to turn over. This would seem to demonstrate that when the ambulance began to back onto the pavement, in front of the automobile, the latter was about 60 feet away. Traveling at forty-five miles per hour, the car was moving 66 feet per second. A portion of this was necessary for mental and physical reactions before the driver could begin to apply his brakes and for them to take effect. Of course, in that emergency he could not know how far into the highway the ambulance would continue, and the natural inclination was to shift far enough to the left to miss it. In doing so, Wolcott went off the pavement onto the shoulder which had some gravel but much mud and water, shown by the photographs taken within a few hours, and there was a drop of some 2½ inches below the pavement which, no doubt, caused the automobile to turn over when striking it in an attempt to return to the paved highway. The space between the pavement and a mail box on the left was less than 5 feet, and the point where the left front wheel left the pavement was a little in excess of 9 feet from the mail box. Confronted by such an emergency, Wolcott, of course, cannot be held to the exercise of an exact judgment, as might be expected of one in a calmer state of mind, and it would not be negligence in such circumstances if he chose a course which might have been a mistake of judgment, so long as it did not amount to conscious carelessness when tested by what the average reasonable individual would do.

### Conclusions of Law

█ It follows that the proximate cause of the accident was the backing onto this much traveled highway of the state by a driver whose vision was completely obscured for the period required for him, after having looked for on-coming traffic, to return to his vehicle, get back in, start his engine and begin to move. In this situation, prudence required that he either request the one whose vehicle made it impossible to get in position to approach the highway in a manner to see whether it was safe to do so, to move it, or that he have someone watch and signal him when it was safe to go ahead. The course which he

pursued was gross negligence, and the defendant has failed to prove contributory negligence on the part of the plaintiffs.

█ It is the conclusion of the court that the automobile was not traveling at an excessive rate of speed and that it did not have time to stop when its driver discovered the situation. The only evidence to support the claim the automobile was traveling at an excessive rate of speed was its turning over and the distance it traveled before coming to rest. This in itself does not refute the positive testimony as to speed by the occupants, which is to some extent corroborated by Penny.

## Quantum of Recovery

█ Wolcott was injured on March 9, 1948, and began to do a little work in February of 1949. Examinations, including X-rays, at Charity Hospital in Pineville, within a few hours after the accident, revealed that he had severe lacerations of the scalp and a fracture of the third lumbar vertebra. He was thrown from the car, knocked unconscious and remained so for some time, having been taken to the hospital in an ambulance. His wounds were sutured, and he was placed in a plaster cast which he wore between three and four months, at the end of which time a Taylor brace was applied, which he continued to wear for almost a year after the accident and during all this time he was unable to do any work of consequence on his chicken farm, from which he made his living.

Wolcott has had a very good recovery, and the preponderance of the evidence is to the effect that his disability to perform his regular work is between 10% and 30%, with his condition still improving. Although an injury of the type involved may in the future induce the formation of rough edges around the joints which could cause some pain and inconvenience in that area, there is no conclusive evidence of substantial permanent injury. At the time of the trial last January, there was still some weakness, but he had complete mobility of his back. He was 36 years old when the accident happened, and had served in World War II fifteen months in the Medical Corps, mainly as an ambulance driver. Wolcott spent from Tuesday, the day of the accident, until Sunday afternoon, or some five days in the Charity Hospital at Pineville, Louisiana, and was then transferred to the Moseley Clinic at New Roads, near his home, where he was confined for about two weeks more. Thereafter, the doctor permitted him to go to his home on condition that he be provided with a hospital bed, which was deemed necessary because of the condition of his back. Otherwise, his condition was as described above. He must have suffered some pain during the early stages of his injuries.

In the late summer of 1949, or about fifteen months after the accident on March 9, 1948, Wolcott had another in which a leg was broken, and this of course had its effect upon his ability to work.

His farm consisted of some twenty acres of land, and about the time of the accident Wolcott had some 1800 chickens, a few hogs, a few cows, raised principally corn and a little cotton, the latter on about three acres. His principal duties were plowing, feeding and looking after the livestock. Primarily, his farming was in raising chickens and cattle. Mrs. Wolcott, with the help of neighbors, took care of these things during her husband's disability, but provided a goodly portion of the support of the family by teaching school. There is no concrete proof as to how much the husband's earnings amounted to, prior to the accident.

The automobile was a 1941 Willys, 4-door sedan, and it was practically demolished in the accident, with the result that nothing substantial was received for it. The evidence seems to support a value of approximately $700. There were also the hospital and doctor's bills due Dr. Moseley of New Roads amounting to $87.00, and to Dr. Abramson of Marksville in the sum of $45.00.

It is the view of the court that the plaintiff Wolcott would be made whole for all of these items by the allowance of a recovery of $5,000.

## Couvillion's Claim

 In view of the conclusions reached as to the right of Wolcott to recover, it follows that Couvillion, the guest, should be awarded such damages as a preponderance of the proof shows he suffered from the accident. He received a laceration of the scalp, another beneath the jaw about 2½ inches long, multiple lacerations of the knee and small contusions to his body. He was seen by Dr. W. J. Plauché, a witness in his behalf, on the day of the accident, after he had had first aid also at the Charity Hospital in Pineville, Louisiana, where the wounds had been sutured, except one on the left leg. "It was rather round-edged. They did not sew it, and it was too late to sew it then, so I treated him and took care of his wounds, and he stayed in the clinic over night." After which the doctor treated the wounds to prevent infection, for about three weeks. "He was about three or four days in a pretty weakened condition, and after that he was pretty good." A wound on the neck got infected, and it had to be treated longer than the others. While the scars can be seen, they do not cause a great deal of disfiguration. There is a scar below the eyebrow and another about 2½ inches long from the angle of the jaw towards the middle" of the chin. He "also lost quite a bit of blood." According to Dr. Plauché, Couvillion was prevented by his injuries from working six or seven days, but thereafter he could attend to most of his duties in running a poultry feed store and packing business. Couvillion states he believes some part of the bones in the elbow joint were chipped off, and says that he had trouble with it. However, no X-rays were taken, and Dr. Plauché makes no mention of it in his testimony. The conclusion is that there was no sufficient proof to establish an injury of this kind.

Couvillion testified that his main business was operating a hatchery, and that Wolcott was one of his customers. The trip on the 9th of March, 1948, was made by the two in the interest of their respective businesses. On cross-examination, Dr. Plauché states that he "could not do any hard labor for four or five days, or actual hard labor for a couple of weeks. Thereafter, there were no ill effects except the scars." The witness further testified that: "He had quite a few cuts. He had one about 6 inches long and about five or six other cuts and he had bruises on the right knee and then bruises on the rib, two or three small cuts here." The scars were pronounced, but "I do not say they are actually disfigurements."

According to Couvillion's own testimony, it was about two weeks before he could go to his store and stay for half a day, and this went on for about three months. He incurred a bill of $73.50 to Dr. Plauché. In his case there was also no proof of his earnings or the value of his services to the business during the period he was incapacitated. There was not a great deal of pain and suffering, and there is no permanent injury. It is the opinion of this court that a total allowance of $750 would compensate fully for his damages.